FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 25-355 |
| *Plaintiff - Appellee,* | D.C. No. 2:15-cr-00465-TJH-2 |
| v. | |
| SHAHRIYAR BOLANDIAN, | |
| *Defendant - Appellant.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, Jr., District Judge, Presiding

Argued and Submitted March 4, 2026
Pasadena, California

Filed April 21, 2026

Before: Kim McLane Wardlaw and Ana de Alba, Circuit
Judges, and Jeffrey Vincent Brown, District Judge.[*]

Opinion by Judge Wardlaw

---

[*] The Honorable Jeffrey Vincent Brown, United States District Judge for
the Southern District of Texas, sitting by designation.

# SUMMARY[**]

## Criminal Law

The panel vacated Shahriyar Bolandian's insider-trading conviction and remanded for a new trial in a case in which Bolandian contended that the district court erred by refusing to dismiss a juror for bias after the juror told the judge he was not sure could be impartial.

The government argued that Bolandian's counsel's agreement with Juror No. 6's continued service waived Bolandian's ability to challenge Juror No. 6 for bias on appeal. The panel held that the district court's independent duty to investigate juror bias that emerges during trial is a prerequisite to any knowing waiver of a juror bias claim, and that defense counsel may not waive the district court's duty to conduct a reasonable inquiry into juror bias that emerges during trial. Because no such investigation took place here, Bolandian forfeited—rather than waived—his challenge to Juror 6 for actual bias on appeal.

Reviewing for plain error, the panel held that Bolandian is entitled to a new trial. Juror No. 6 came forward to express bias, and the district court impermissibly delegated its responsibility to investigate the juror for bias to the juror himself, who served for the remainder of trial. The panel concluded that this was plain error, as the district court violated its duty to erect and employ a suitable framework for investigating the bias allegation and gauging its effects. Rather than inquire further into the reasons for Juror

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

No. 6's feelings of bias, or make an attempt to rehabilitate him, the district judge put the onus on Juror No. 6 to monitor his own bias. In doing so, the district judge abdicated his indispensable role in preserving for the accused an impartial jury. Nor does the record provide other assurances that Juror No. 6 was not actually biased. The panel held that the district court thus plainly erred in failing to strike Juror No. 6 from the jury, and that the errors affected Bolandian's substantial rights and seriously affected the fairness, integrity or public reputation of the judicial proceedings.

## COUNSEL

Andrew M. Roach (argued), Assistant United States Attorney, Deputy Chief, General Crimes Section; William Larsen, Attorney; Ali Moghaddas, Solomon D. Kim, and Jonathan Galatzan, Assistant United States Attorneys; Christina T. Shay, Assistant United States Attorney, Chief, Criminal Division; Bilal A. Essayli, Acting United States Attorney; Office of the United States Attorney, United States Department of Justice, Los Angeles, California; Jeremy R. Sanders, Trial Attorney, United States Department of Justice, Washington, D.C.; for Plaintiff-Appellee.

Rachel A. Robinson (argued), Alyssa D. Bell, and Reuven Cohen, Cohen Williams LLP, Los Angeles, California; Richard M. Steingard, Law Offices of Richard M. Steingard, Los Angeles, California; for Defendant-Appellant.

## OPINION

WARDLAW, Circuit Judge:

Shahriyar Bolandian appeals from his conviction and sentence for six counts of insider trading, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5. On appeal, Bolandian contends that the district court erred by: (1) refusing to dismiss a juror for bias after the juror told the judge he was not sure he could be impartial; (2) admitting a statement from the alleged tipper against Bolandian; (3) allowing the government to misstate the reasonable doubt standard; and (4) failing to follow proper procedure during sentencing. We need not address any issue other than the first because we conclude that the district court failed to adequately investigate the juror for actual bias, thus impinging upon Bolandian's Sixth Amendment right to an impartial jury.

## I.

Shahriyar Bolandian and Ashish Aggarwal were close friends in college, graduating in 2010. Following graduation, Aggarwal began working in J.P. Morgan's San Francisco office as an investment banking analyst in the Technology, Media, and Telecom ("TMT") Group. Bolandian moved back home to Los Angeles. Bolandian and Aggarwal were both interested in trading stocks, but J.P. Morgan's policies prohibited Aggarwal from trading stocks himself.

Bolandian began trading stocks with his childhood friend, Kevan Sadigh, and Bolandian and Sadigh sometimes made trades on Aggarwal's behalf. Bolandian and Aggarwal often emailed and talked on the phone to discuss stocks.

Between September and October 2012, Bolandian borrowed approximately $230,000 from family and friends to support his trades. By March 2013, after a series of unsuccessful trades, Bolandian and Aggarwal had lost over $200,000.

This case arises from two of Bolandian's trades, which involved companies represented by J.P. Morgan which were on the brink of a merger. *First*, in March 2012, Integrated Device Technology, Inc. ("IDTI") hired J.P. Morgan's TMT group to advise on its upcoming acquisition of PLX Technologies ("PLXT"). At the time, Aggarwal worked in the TMT Group, but he was not assigned to the deal between IDTI and PLXT. Between April 17 and April 19, 2012, Bolandian purchased call options and common stock of PLXT. On April 30, 2012, IDTI's merger with PLXT was publicly announced, and Bolandian sold his stock, which had risen by nearly 70%, netting him approximately $25,000 in his personal account and $2,500 in his father's account.

*Second*, in May 2013, ExactTarget ("ET") hired J.P. Morgan's TMT Group to advise on its tender purchase offer from Salesforce.com ("CRM"). As with the PLXT deal, Aggarwal worked in the TMT Group at the time, but he was not assigned to the ET-CRM deal. Between May 28 and June 3, 2013, Bolandian purchased ET call options. Bolandian also purchased ET options on behalf of his father and sister in their personal brokerage accounts. Bolandian had never purchased ET stock or options before.

The CRM-ET deal was publicly announced on June 4, 2013, and ET's stock price increased by 52% overnight. Bolandian immediately sold his ET stock. Bolandian made approximately $300,000 in his personal account, and $100,000 in his father and sister's personal accounts. A few days later, Aggarwal left his job at J.P. Morgan.

In September 2013, Aggarwal had dinner with Leonid Rozkin, a former J.P. Morgan colleague who had been friends with Aggarwal and Bolandian in college. Rozkin later testified that Aggarwal told Rozkin during the dinner that "he let [the CRM-ET deal] slip once or twice to [Bolandian]" before the acquisition. Rozkin stated that this exchange made him "uncomfortable," and he ended the conversation and advised Aggarwal to get a lawyer.

## II.

In August 2015, Aggarwal, Bolandian, and Sadigh were charged in a 31-count indictment with conspiracy to commit insider trading and tender offer fraud, 18 U.S.C. § 371; insider trading, 15 U.S.C. §§ 78j(b), 78ff; tender offer fraud, 15 U.S.C. §§ 78n(e), 78ff; wire fraud, 18 U.S.C. § 1343; and money laundering, 18 U.S.C. § 1957. All three defendants were charged in the first 30 counts; only Bolandian was charged with money laundering.

Aggarwal moved to sever his trial from Bolandian and Sadigh's trials. Aggarwal argued that the government's introduction of Aggarwal's statement to Rozkin, that Aggarwal "accidentally" shared inside information with Bolandian, created the possibility of "antagonistic defenses." Aggarwal explained that "while Mr. Aggarwal could embrace Mr. Rozkin's testimony, emphasizing Mr. Aggarwal's lack of intent, Mr. Bolandian and Mr. Sadigh would likely seek to undermine Mr. Rozkin, suggesting that Mr. Rozkin, and hence Mr. Aggarwal, are lying." The district court granted Aggarwal's motion for severance based on the possibility of antagonistic defenses.

Aggarwal proceeded to trial in January 2017, and the government introduced Aggarwal's out-of-court statement to Rozkin that he "accidentally" tipped Bolandian. After a

10-day trial, the jury acquitted Aggarwal on twenty-six counts and was unable to reach a verdict on the remaining four, which the district court then dismissed.

Following Aggarwal's acquittal, the government filed a second superseding indictment against Bolandian and Sadigh. The new indictment removed the conspiracy count but left the substantive counts of insider trading. Prior to trial, Sadigh's case was severed from Bolandian's for reasons unrelated to this appeal.

## III.

On April 2, 2024, Bolandian proceeded to trial. Before the second day of trial began, Juror No. 6 sent the district court a note stating that:

> My uncle, who I mentioned works with my father, is the owner of a private investment firm in San Francisco and has conducted business with J.P. Morgan in the past to my knowledge and might possibly have a relationship to today's witness.

Defense counsel asked the district court if it would "be willing to . . . bring out Juror Number 6 and just maybe inquire further?" Defense counsel stated that his "suggestion . . . would just be to have Juror Number 6 come out and just have the Court ask a couple of questions . . . just like the voir dire questions. Is this the sort of relationship you think would influence your opinion? Would you still be able to be fair? Follow the Court's instructions? Something like that."

The government stated that "we largely defer to the defense. If they'd like to strike him and have him replaced or if they don't object to him continuing to serve on the jury,

and we can move forward." The district court called Juror No. 6 into court and had the following exchange with him:

> **THE COURT:** Have you spoken to your uncle at all?
>
> **JUROR #6:** No, sir.
>
> **THE COURT:** Well, that's good. You should not. I appreciate you having sent the note here. And you understand that during this case, you're not free to talk to your uncle or anyone else about this matter at all?
>
> **JUROR #6:** Yes, Your Honor.
>
> **THE COURT:** All right. And if something does come to your attention about the case from anybody, would you let me know before you speak to any of your fellow jurors about it?
>
> **JUROR #6:** Yes, Your Honor.
>
> **THE COURT:** All right. Thank you. As far as you're concerned, do you still feel that you can be fair to both sides in this matter?
>
> **JUROR #6:** Honestly, I am not sure, Your Honor.
>
> **THE COURT:** Well, you're not sure whether you can be fair?
>
> **JUROR #6:** Yes, Your Honor.
>
> **THE COURT:** Well, that's probably a good thing since you haven't heard all the evidence yet. Once you've heard all of the evidence

and you still feel that way, you should let the Court know.

**JUROR #6:** Yes, Your Honor.

**THE COURT:** All right.  Thank you.

The government asked defense counsel to "state their position as to [Juror No. 6] for the record."  Defense counsel stated that:

> [W]e have no objection to his continuing to serve.  And I -- I guess if he takes the Court's admonishment seriously -- and I hope that he does -- and if he still maintains that he feels some sense of prejudice towards either side, then he'll -- he'll let the Court know, and we'll still have the alternates, hopefully, at that time.

The district court allowed Juror No. 6 to continue to serve.  After closing arguments, the parties revisited the district court's prior instruction to Juror 6.  The government informed the district court that "[t]he parties have conferred" and "since [Juror No. 6] hasn't raised it, there's no need to further inquire with him," and "we'd ask him [to] continue to serve on the jury, and we don't need to voir dire him further."  Defense counsel agreed, stating, "[t]hat's correct, Your Honor."  Juror No. 6 continued to serve and eventually became the foreman of the jury.

The jury ultimately returned a guilty verdict, and Bolandian was sentenced to 24 months in prison.  Bolandian timely appealed, arguing that he is entitled to a new trial or, in the alternative, that he is entitled to a new sentencing hearing.

## IV.

Bolandian argues that the "district court's failure to excuse expressly biased Juror No. 6 denied Bolandian a fair trial." The government argues that Bolandian's counsel's agreement with Juror No. 6's continued service waived Bolandian's ability to challenge Juror No. 6 for bias on appeal. Bolandian argues that his claim is reviewable, at minimum, under the plain error standard.

The Supreme Court has explained that "[w]aiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (citation and quotation marks omitted). Forfeited claims are reviewed under the plain error standard. "Plain error is (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Hammons*, 558 F.3d 1100, 1103 (9th Cir. 2009) (citation and quotation marks omitted). If these conditions are met, the reviewing court has the discretion to grant relief so long as the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. (citation omitted).

While forfeited claims are reviewed for plain error, waiver "extinguish[es]" the possibility of an "error" altogether. *Olano*, 507 U.S. at 733. Thus, "[a]ttention to the distinction between forfeiture and waiver" is of crucial importance, given that it "results in a distinction between plain error appellate review and no appellate review." *United States v. Depue*, 912 F.3d 1227, 1234 (9th Cir. 2019). "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the

defendant's choice must be particularly informed or voluntary, all depend on the right at stake." *Olano*, 507 U.S. at 733 (citation omitted).[1]

We have not squarely addressed the question of under what conditions a juror bias claim may be waived. We write in this case to explain that the district court's independent duty to *investigate* juror bias that emerges during trial is a prerequisite to any knowing waiver of a juror bias claim. The district court's duty to investigate cannot itself be waived. Because no such investigation took place here, we need not resolve the questions of whether a juror bias claim may be waived by defense counsel, following a proper investigation.

## A.

The Sixth Amendment guarantees criminal defendants a trial "by an impartial jury." U.S. Const. amend. VI. "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel." *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977).

"We have analyzed juror bias under two theories— actual bias and implied bias." *United States v. Mitchell*, 568 F.3d 1147, 1151 (9th Cir. 2009) (citation omitted). Actual bias is "bias in fact" and is found where "a prospective juror states that he cannot be impartial, or expresses a view

---

[1] As one treatise explains, "[g]eneral agreement exists that the decisions as to guilty plea, jury trial, appeal, and the defendant testifying are for the defendant [to waive], and that decisions on a substantially larger group of matters, such as objecting to inadmissible evidence, are for counsel [to waive]. As to various other decisions, however, the courts either have not spoken or are divided." 2 W. LaFave & J. Israel, Criminal Procedure § 11.6 (1984).

adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view." *Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007) (en banc). Implied bias is "bias conclusively presumed as a matter of law" and exists where "an average person in the position of the juror in controversy would be prejudiced." *United States v. Gonzalez*, 214 F.3d 1109, 1111–12 (9th Cir. 2000) (citation omitted). Bolandian raises only a claim of actual bias in this appeal.

## B.

"A court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances." *Dyer v. Calderon*, 151 F.3d 970, 974 (9th Cir. 1998) (en banc). This duty was first outlined in two Supreme Court cases: *Remmer v. United States*, 347 U.S. 227 (1954), and *Smith v. Phillips*, 455 U.S. 209 (1982). In *Remmer*, the defendant was convicted by a jury in federal court for income tax evasion. 347 U.S. at 228. After the verdict, the defendant learned that a person had approached a juror during trial and told him that he could profit by entering a verdict for the defendant. *Id.* During trial, the juror "reported the incident to the judge, who informed the prosecuting attorneys" but not the defense. *Id.* The FBI investigated and concluded that the statement was "made in jest." *Id.* The Supreme Court vacated and remanded, reasoning that the "trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.* at 229–30.

In *Smith*, the defendant was tried and convicted in New York state court for murder and attempted murder. 455 U.S. at 210. After the verdict, the defendant learned that during the trial, one of the jurors had applied to the district attorney's office for a job during the trial. *Id.* at 212. The defendant moved to set aside the verdict. *Id.* at 213. The trial court held a hearing at which the prosecutors and juror testified, and then the court denied the motion. *Id.* In reviewing the defendant's petition for federal habeas relief, the Supreme Court held that the trial court's hearing properly investigated the allegation of bias, explaining:

> Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge *ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences* when they happen. Such determinations *may* properly be made at a hearing like that ordered in *Remmer* and held in this case.

*Id.* at 217 (emphasis added). Applying this principle, the Supreme Court concluded that "if in the federal system a post-trial hearing such as that conducted here is sufficient to decide allegations of juror partiality, the Due Process Clause of the Fourteenth Amendment cannot possibly require more of a state court system." *Id.* at 218.

We have explained that *Remmer* and *Smith* provide a "flexible rule." *Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003). While an "evidentiary hearing is not mandated *every* time there is an allegation of jury misconduct or bias" during trial, the "court must consider the content of the allegations, the seriousness of the alleged

misconduct or bias, and the credibility of the source."
*United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993).

In *Dyer*, we applied this rule from *Remmer* and *Smith* to
a situation where the defendant learned, after the jury's
guilty verdict but before sentencing, that one of the jurors
had lied during voir dire. 151 F.3d at 974. Dyer was on trial
for taking four hostages and shooting them. *Id.* at 972.
During voir dire, the jurors were asked if they had any
relatives who had been the victim of a crime or accused of
any offense. *Id.* One of the jurors answered "no" to both
questions. *Id.* After the guilty verdict, however, Dyer
learned that the juror's brother had been shot and killed six
years earlier, in a situation resembling the allegations against
Dyer. *Id.* When Dyer's counsel notified the judge, the judge
called the juror into his chambers for "less than five
minutes," failed to question her about the details of her
brother's crime, and allowed her to continue to serve for
sentencing. *Id.* at 974.

We reversed and remanded. We explained that, under
*Remmer* and *Smith*, when a juror is suspected of bias during
trial, an "extremely delicate situation" arises, given that
"lawyers may not conduct the kind of aggressive
investigation of jurors they would of other witnesses." *Id.* at
978. Thus, the judge "fulfills his duty only if he 'erects, and
employs, a suitable framework for investigating the
allegation [of bias] and gauging its effects.'" *Id.* (quoting
*United States v. Boylan*, 898 F.2d 230, 258 (1st Cir. 1990)
(alterations in original)). In sum, "[w]here juror . . . bias is
credibly alleged, the trial judge cannot wait for defense
counsel to spoon feed him every bit of information which
would make out a case of juror bias; rather, the judge has an
*independent responsibility* to satisfy himself that the
allegation of bias is unfounded." *Id.* (emphasis added).

### C.

This case presents a wrinkle not present in *Remmer*, *Smith*, or *Dyer*: after the allegedly biased juror came forward and was briefly questioned by the trial judge, defense counsel affirmatively *agreed* that the juror in question could continue to serve. We hold that the agreement of Bolandian's counsel did not waive his juror bias claim here.

Bolandian appears to concede that if it was *possible* for his trial counsel to waive his juror bias claim here, he did so. After all, after Juror No. 6 came forward to express that he may be biased, the government "defer[red] to the defense," and Bolandian's counsel stated that "we have no objection to his continuing to serve." Then, after closing arguments, Bolandian's counsel stated again that he agreed with Juror No. 6's continued service. Given these multiple instances of express agreement, Bolandian argues on appeal that his trial counsel did not have the *authority* to waive the juror bias claim because a biased jury is a "structural error" that can never be waived or, alternatively, because a biased jury is a "fundamental" right that must be waived by the defendant personally, rather than through his counsel. The government disagrees with both arguments.

We need not resolve the broader questions of whether juror bias is a "structural" error that may *never* be waived or a "fundamental" right that requires a defendant's personal waiver. Rather, we hold that, at minimum, defense counsel may not waive the district court's duty to conduct a reasonable inquiry into juror bias that emerges during trial. Because such an investigation would be a prerequisite to a knowing waiver of a juror bias claim, no waiver occurred here.

"[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (citation and quotation marks omitted). As we previously described, one safeguard of the right to an impartial jury is a judge "ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith*, 455 U.S. at 217. Thus, a judge confronted with jury bias during trial has an "independent responsibility to satisfy himself that the allegation of bias is unfounded" and "cannot wait for defense counsel to spoon feed him every bit of information which would make out a case of juror bias." *Dyer*, 151 F.3d at 978.

Here, defense counsel could not waive the judge's duty to investigate alleged bias that emerged during trial. As we have explained, when an allegation of juror bias emerges during trial, an "extremely delicate situation" arises, given that, "[w]hile a trial is ongoing, lawyers may not conduct the kind of aggressive investigation of jurors they would of other witnesses." *Id.* In such circumstances, the district court "fulfills [its] duty only if [it] 'erects, and employs, a suitable framework for investigating the allegation [of bias] and gauging its effects.'" *Id.* (alterations in original) (citation omitted). To allow defense counsel's assent to waive this duty would be to ignore the district court's crucial role in safeguarding a defendant's Sixth Amendment right to an impartial panel. *See Hendrix*, 549 F.2d at 1227 (district court has "both a great responsibility and a wide discretion to give meaning to this guarantee" of an impartial panel).

Absent a district court's reasonable investigation of a juror bias claim, no subsequent waiver of a juror bias claim can be valid. Waiver requires an "intentional relinquishment or abandonment of a *known* right." *Depue*, 912 F.3d at 1232 (emphasis added) (citation omitted). If the right is not

"known," then the claim cannot be waived, and we review the claim for plain error. *Id.* We have explained that an "uninformed representation to the court is not alone sufficient evidence of waiver," and is instead reviewed for plain error.[2] *Id.* Thus, if waiver of a juror bias claim is possible (and, again, we do not decide this issue), it would be possible only after a reasonable investigation into the alleged bias takes place. Because no such investigation took place here, we hold that Bolandian forfeited—rather than waived—his challenge to Juror No. 6 for actual bias on appeal.

## V.

Proceeding to the merits, we hold that Bolandian is entitled to a new trial. Juror No. 6 came forward to express bias, and the district court impermissibly delegated its responsibility to investigate the juror for bias to the juror himself, who served for the remainder of trial.

First, we conclude that there was "error," that was "plain." *Olano*, 507 U.S. at 734. The district court violated its duty to "erect[] and employ[] a suitable framework for investigating the allegation [of bias] and gauging its effects." *Dyer*, 151 F.3d at 978 (citation modified). Juror No. 6 came forward to tell the district court he may be biased. When the district court asked Juror No. 6 if he could "be fair to both sides in this matter," Juror No. 6 answered, "I am not sure."

---

[2] For example, in *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997), we held that a defendant forfeited, as opposed to waived, his right to appeal an erroneous jury instruction even though his own attorney submitted the instructions at trial. *Id.* at 845–46. We explained that although defense counsel submitted the instructions, there was "no evidence" that he understood what the correct instructions would have been and "affirmatively acted to relinquish a known right." *Id.*

The district court followed up, asking him, "you're not sure whether you can be fair?", and Juror No. 6 confirmed, "Yes, Your Honor." The district court did not inquire further, but instead instructed Juror No. 6 to "let the Court know" if he still felt biased once he had "heard all of the evidence."

This procedure of "putting the onus on a juror to speak up, after a trial starts," improperly delegated the district court's duty to investigate juror bias to the juror himself. *United States v. Kechedzian*, 902 F.3d 1023, 1030 (9th Cir. 2018). We rejected a similar procedure in *Kechedzian*. There, during jury selection in a credit card counterfeiting case, the district court asked if the prospective jurors felt "they could not be fair and impartial to both sides." *Id.* at 1026. Juror # 3 raised her hand and stated that her social security card had been stolen previously and she "might be able to put that aside." The following colloquy ensued:

> **THE COURT:** We need to know whether or not you are going to decide this case based on what happened to you and your social security number. What do you think?
>
> **JUROR # 3:** Well, I would want to put my personal stuff aside, but I honestly don't know if I could.
>
> **THE COURT:** So will you tell us if you can't, if all of a sudden you go through this case and you say you know what? My social security number is popping up in my head, and I'm going to decide this case based on what happened to me? Would you tell us that?

> **JUROR # 3:** No, I would try to be fair . . . and put my personal experience aside.
>
> **THE COURT:** But if it turns out you're going through this process and you feel you can't—it's not working, would you tell us?
>
> **JUROR # 3:** Yes, I would.
>
> **THE COURT:** Okay. All right.

*Id.* We reversed and remanded for a new trial. *Id.* at 1031. We explained that "Juror # 3 never affirmatively stated that she could be impartial," and "not only were all of Juror # 3's responses equivocal, but she explicitly noted that she was unsure if she could put her personal biases aside." *Id.* at 1029–30. Moreover, we explained that "there was nothing particularly curative about this arrangement in which Juror # 3 was to tell the judge later if she felt biased," given that it is "unrealistic to expect that a juror could fairly make constant assessments of whether her feelings towards the accused were the justifiable consequence of the evidence presented so far or due to her earlier life experiences." *Id.* at 1030 (citation modified); *see also Smith*, 455 U.S. at 230 ("Even when the bias was not part of an affirmative course of misconduct, however, but was unconscious, a juror is unlikely to admit that he had been unable to weigh the evidence fairly.") (Marshall, J., dissenting).

So too, here. Rather than inquire further into the reasons for Juror No. 6's feelings of bias, or make an attempt to rehabilitate him, the district judge put the onus on Juror No. 6 to monitor his own bias. In doing so, the district judge abdicated his "indispensable role in preserving for the accused an impartial jury." *Kechedzian*, 902 F.3d at 1030.

Nor does the record provide other assurances that Juror No. 6 was not actually biased. "When a juror is unable to state that she will serve fairly and impartially despite being asked repeatedly for such assurances, we can have no confidence that the juror will 'lay aside' her biases or her prejudicial personal experiences and render a fair and impartial verdict." *Gonzalez*, 214 F.3d at 1114. Here, Juror No. 6 "never affirmatively stated that [he] could be impartial." *Kechedzian*, 902 F.3d at 1029. Indeed, Juror No. 6's repeated statement that he was "not sure" he could be fair was more equivocal than the statements of "I'll try" that we have previously found to be too equivocal. *See Gonzalez*, 214 F.3d at 1113 n.5 ("If a parent asks a teenager whether he will be back before curfew, that parent is highly unlikely to find 'I'll try' an adequate, satisfactory, or unequivocal response."). Thus, we hold that the district court plainly erred in failing to strike Juror No. 6 from the jury. *See Mitchell*, 568 F.3d at 1151.

Finally, we conclude without difficulty that the errors here affected Bolandian's substantial rights and seriously affected the fairness, integrity or public reputation of the judicial proceedings. *Olano*, 507 U.S. at 734–36. We have explained that "[t]he presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice." *Dyer*, 151 F.3d at 973 n.2; *see also Mitchell*, 568 F.3d at 1150 (our cases "circumscribe[e] the scope of plain error review with respect to [juror bias] claims so that a defendant need not demonstrate that he was prejudiced by the presence of the challenged juror").

The potential for bias is particularly apparent here, given the tension between Aggarwal's acquittal and Bolandian's conviction. Indeed, at oral argument, we asked the government why Aggarwal was acquitted while Bolandian

was convicted.  The government answered, "Well, they were tried separately, your Honor, they had different juries." Indeed, in Bolandian's case, the juror who expressed bias later became the foreman of the jury.  Because we cannot know if the different outcomes for the two college friends were due to jury bias, and the bias of even one juror denies the defendant "his Sixth Amendment right to an impartial panel," we reverse and remand for a new trial.  *Hendrix*, 549 F.2d at 1227.

## CONCLUSION

Accordingly, we vacate the judgment of conviction and **REVERSE** and **REMAND** for a new trial.